IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ALVIN RICHARDSON,

    Petitioner,

  v.

MATTHEW CATE, Secretary of the California Department of Corrections and Rehabilitation, and JOHN MARSHALL, Warden of the California Men's Colony,

    Respondents.

No. C 09-02227 WHA

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

This is a habeas action brought by a state prisoner under 28 U.S.C. 2254. Petitioner asserts ineffective assistance of trial counsel. For the reasons set forth below, the petition is **DENIED**.

## STATEMENT

Following a trial in Alameda Superior Court of petitioner Alvin Richardson, age 16, and Jeffrey Galbraith, age 15, petitioner was convicted of second-degree murder and sentenced to prison for fifteen years to life. Richardson has exhausted both direct and habeas review in state court.

The following facts are drawn from the decision of the California Court of Appeal on the direct appeal of the underlying state conviction, *People v. Galbraith*, Nos. A095311, A099747, 2003 WL 932506 (Cal. App. Mar. 10, 2003) (Exh. I), the state trial decision denying petitioner's habeas petition (Exh. P), and a review of the record.

On November 17, 1997, a botched daylight robbery of a furniture store on Oakland's Fruitvale Avenue resulted in the death of the proprietor of the store, Isaias Aparicio. During the robbery, the victim and at least one of petitioner and Mr. Galbraith struggled over a handgun. Four shots were fired. The struggle left Aparicio dead from two gunshot wounds. Petitioner and Mr. Galbraith each suffered a gunshot wound.

Both petitioner and Mr. Galbraith gave lengthy statements to police. Just after the murder each went to a local hospital for treatment of his gunshot wound, where police were routinely alerted. As the furniture store robbery was investigated, both became murder suspects while still hospitalized. They were transported to the police station and interviewed by homicide investigators on the evening of the day of the murder. Portions of these interviews were tape-recorded. The primary evidence against both defendants at trial consisted of their statements to police in these interviews. The circumstances of the interviews will be discussed below in the context of the procedural history of the defendants' challenges to their validity.

On November 19, 1997, petitioner was charged under California Welfare and Institutions Code Section 602, with murder while armed with a firearm (California Penal Code Sections 187 and 12022(a)), with the special circumstance of robbery felony murder (Section 190.2(a)(17)(I)), and with attempted robbery (Section 211/664). On June 25, 1998, the charges against petitioner were amended to allege that he was personally armed with a firearm (Section 12022.5).

The prosecution moved for findings that both petitioner and Mr. Galbraith were unfit for treatment by the juvenile court. Because of their ages and the murder charges, defendants were presumed unfit for the juvenile court system under Welfare and Institutions Code Section 707. The presumption of unfitness could only be overcome if the juvenile court found defendants were amenable to juvenile court treatment, based on five statutory criteria: (1) the degree of criminal sophistication exhibited by the minor; (2) whether the minor could be rehabilitated prior to the expiration of the juvenile court's jurisdiction; (3) the minor's previous delinquent history; (4) success of previous attempts by the juvenile court to rehabilitate the minor; and (5) the circumstances and gravity of the offenses alleged in the petition to have been committed by the minor. Cal. Welf. & Inst. Code § 707(c).

2

On October 21, 1998, the juvenile court commenced a fitness hearing. The court found both defendants amenable to juvenile court treatment on the first four criteria, but not on the fifth. "I cannot find them amenable on [] the circumstances and gravity of the offense. . . . I can see no circumstance under which this case can be anything less than felony first degree murder. . . . [A]nd then . . . I'm supposed to consider extenuating or mitigating circumstances, and frankly I find none. This is exactly the evil which the legislation was designed to protect against . . ." (Exh. C-2 at 94–95). The juvenile court therefore found both petitioner and Mr. Galbraith unfit for treatment by the juvenile court system.

On September 23, 1999, an information charged petitioner with first degree murder (California Penal Code Section 187), with an enhancement allegation that he was armed with a firearm (Section 12022(a)(1)), with the special circumstance of robbery felony murder (Section 190.2(a)(17)(A)), and with a second count of attempted robbery while armed with a firearm (Sections 211/664 and 12022(a)(1)). By agreement of the parties, the court dismissed the attempted robbery count, leaving only the murder charge, the firearm enhancement, and the special circumstance.

Prior to trial, Mr. Galbraith filed a motion to suppress his statements to police. In his written motion, Galbraith's counsel argued that all of his statements to police should be suppressed because of *Miranda* violations and because his statements were involuntary and therefore inadmissible. The case came up for jury trial in Alameda County Superior Court on April 11, 2001. The parties stipulated that if defendants would waive their right to a jury trial, a bench trial "[would] proceed . . . with the understanding that there will be a murder in the second degree top." Each defendant told the court he understood the stipulation and formally waived jury trial. The court stressed that "the top is a second degree" and that the maximum sentence for second-degree murder was 15 years to life. Following the stipulation and waivers, petitioner's counsel, Attorney C. Don Clay, orally joined in Galbraith's suppression motion (Exh. C-3 at 1–5).

The matter came up for court trial on April 16, 2001. The court granted the prosecution's motion to dismiss the robbery felony-murder special circumstance. The court indicated that it would hear the motion to suppress concurrently with the trial, per stipulation of counsel. The

3

bulk of the evidence heard and received consisted of the defendants' statements to police on the night of the day of the crimes and police testimony regarding the circumstances under which the statements were taken.

Regarding the police interviews of petitioner, the evidence at trial showed that Oakland Police Sergeant Bruce Brock interviewed petitioner at the Oakland Police Department's homicide section on November 17, 1997 — the day of the crime — beginning at 6:10 p.m. Petitioner had suffered a gunshot wound to the cheek, with an exit wound in the neck. The wound had been bandaged. Sergeant Brock read petitioner his *Miranda* rights from an admonition form. Brock asked petitioner if he understood each of his rights, and petitioner said that he did. Brock asked petitioner, "[H]aving these rights in mind, do you wish to talk to us now?" Petitioner shrugged and said "yes." He initialed and signed the admonition form to memorialize that he wished to talk to the officer. At first, petitioner told Brock that he was shot while getting off a bus in the area of 73rd and East 14th Streets in Oakland. Then his story changed and he admitted that he was shot at the furniture store, and he eventually admitted that he was in the store to commit a robbery. This part of the interview was not tape-recorded.

At 7:53 p.m., Brock began a tape-recorded interview with petitioner. At the outset, Brock walked petitioner through the untaped interview, starting with the *Miranda* warnings and petitioner's agreement to talk. Petitioner admitted he initially lied to Brock about where and how he was shot. Petitioner agreed that he had established a rapport with Brock, and had been told that Galbraith "was blaming everything" on him. Petitioner agreed to tell Brock "what really happened." He said he went into the furniture store "as a joke." He asked about some furniture, turned his back on the man, turned back around and saw the man was pointing a gun at him. Petitioner grabbed the gun and struggled with the man. He heard about four gun shots. He realized he'd been shot in the face, ran out of the store, and got a ride to a hospital (Exh. B at 406–11).

Petitioner denied having a gun when he entered the store. He said he grabbed the gun to keep from getting shot. When asked if Galbraith went into the store with him, petitioner said, "I don't remember what happened," and "What I remember is what I just told you, that's all I

4

remember, is tussling with the gun . . ." He also said, "if my name is brought up in anything besides what you all heard from out my mouth, it ain't true." Petitioner denied having any intent to rob the store, observing that "if it was my intention to rob the place I would have shot [the man]. Other than him shoot me." Petitioner asked, "Can I go home?" Brock responded, "Well, just hold up for a second," and stopped the tape. The time was 8:12 p.m. (Exh. B at 412–17).

Brock took a short break, left the interview room, and spoke to Oakland Police Sergeant Joyner, who had conducted a taped interview with Mr. Galbraith between 7:00 and 7:30 p.m. Brock played parts of that tape to petitioner. This led to a second taped interview with petitioner, which began at 8:42 p.m. Again, Brock walked petitioner through his waiver of his *Miranda* rights and his agreement to talk. Petitioner said he wanted to talk more "because I didn't know it was this serious, I didn't know that [some]one died, and I thought I was the only one that had got shot" (Exh. B at 418–19).

Petitioner said he spoke to Galbraith about going to the furniture store to rob it, but that he was only joking. But Galbraith took him seriously and "convinced me so then I did it." The situation "escalated." It became "real" and the two asked a woman to go inside and see "what was in there." But petitioner insisted "nothing [was] planned, and when we went in there it was a joke [] but then it escalated . . ." Petitioner again denied having a gun and said Galbraith had the gun. He said Galbraith demanded Aparicio's wallet, telling Aparicio to "break his self," which is apparently slang for "give me your money." Aparicio produced his wallet and either Aparicio or Galbraith removed the money (Exh. B at 419–21).

Petitioner turned around to take a mobile phone, and when he turned back around he saw Aparicio pointing a gun at him. He wasn't sure if it was Galbraith's gun. Petitioner grabbed the gun because he thought Aparicio was going to shoot him or Galbraith. There was a struggle over the gun and petitioner heard four shots. He and Galbraith ran out of the store, and he dropped the mobile phone. Petitioner said he and Galbraith had no plans to divide the stolen money: "I didn't want the money, I told you it was a joke to me . . . [Galbraith] took it to[o] far . . . I had money in my pocket, I could of did whatever I wanted to do." He had known Galbraith for about a month.

5

1  Petitioner told Brock, "I feel that none of that should have happened. I feel real sorry about that."
2  The second tape-recording concluded at 8:58 p.m. (Exh. B at 422–29).

3  Lastly, from 9:20 p.m. to 10:37 p.m., the police interviewed both petitioner and Mr.
4  Galbraith together. They first reiterated the waiver of their *Miranda* rights. Petitioner and Mr.
5  Galbraith discussed their motivations for committing the crime; petitioner said he wanted to buy
6  some marijuana and Mr. Galbraith said he wanted to replace his family's broken VCR and buy
7  groceries. They both denied entering the furniture store with a gun. Most of the interview
8  involved police questions to both defendants to try to reconstruct what occurred in the store,
9  though contradictions from the two defendants made that difficult (Exh. B at 337–405). When
10 asked about his mother, petitioner described that he had spoken to her briefly at the hospital (Exh.
11 B at 395).

12 On cross-examination at trial, Sergeant Brock testified that he recalled no medication
13 being administered to petitioner during the interviews, could recall no complaints from petitioner
14 about being in pain, and could recall no request by petitioner to have his mother present during
15 the interviews. The transcripts of the recordings reveal no request by petitioner to see his mother.

16 The trial court denied the motion to suppress as to both defendants: "I don't think that
17 there is evidence of coercion in this particular case, and I think the statements were given freely
18 and voluntarily and I think they understood their *Miranda* rights which they knowingly waived
19 freely and voluntarily." The court proceeded to find both petitioner and Mr. Galbraith guilty of
20 second-degree murder. They were sentenced to 15 years to life.

21 Petitioner filed a direct appeal and an accompanying state habeas petition. The California
22 Court of Appeal affirmed the judgment and denied the habeas petition without prejudice,
23 directing the petitioner to develop additional facts in a new habeas petition. Petitioner sought
24 rehearing of the Court of Appeal's denial of the habeas petition, which was denied. Petitioner
25 filed a further appeal to the California Supreme Court which was also denied on September 16,
26 2003.

27 While his first appeal to the California Supreme Court was still pending, petitioner filed a
28 new habeas petition in Alameda County Superior Court. This petition argued that trial counsel

6

had rendered ineffective assistance. Petitioner submitted a declaration in support of his petition that stated that during the interview he was scared, medicated, and in pain, that he had asked to speak with his mother, and that he was promised he would be able to go home after the interview. After an evidentiary hearing, that petition was denied on December 4, 2006. The decision of the Superior Court reviewed evidence from the record and from the evidentiary hearing that caused it to deny the petition (*see* Exh. P). It was clear that the versions of petitioner and the officers about what occurred at the stationhouse during the interviews (but not captured by the tapes) were opposed. In short, the court believed the officers and not the petitioner.

The petition was also based on an argument that petitioner told his trial counsel all of the things in his declaration about what occurred during the interview and that counsel did not act on them, resulting in ineffective assistance. Here too, the court found counsel's testimony credible and petitioner's testimony not credible. The court found that "Richardson's testimony at the hearing was, at best, based on his false recollection of the actual truth. . . . The fact is that Richardson's testimony is just about the only evidence that supports his allegations, and Richardson is just not a very credible witness." The court noted that, of course, "counsel could not be faulted for failing to file and argue motions for which there [wa]s no factual basis." The court held that the outcome of the issues presented in the petition was "dictated by the credibility of the witnesses," and accordingly denied the petition.

Petitioner appealed this denial to the California Court of Appeal, and that appeal was denied on September 20, 2007. A final state petition was filed with the California Supreme Court, and that appeal was denied on June 18, 2008. Petitioner then filed the instant federal petition on May 20, 2009. Respondent initially moved to dismiss the petition as untimely, but that motion was denied. Subsequent briefing on the merits of the petition has been received and considered.

**ANALYSIS**

Petitioner brings two claims for habeas relief, both based on the assertion that his trial counsel rendered prejudicial ineffective assistance. He contends that: (1) his counsel was ineffective for failing to move to suppress his statements to police in a motion separate from his

7

1  co-defendant, and (2) his counsel was ineffective for failing to require the prosecution to establish
2  a prima facie case before the presumption that he could not be tried as a juvenile could apply.
3  These claims are based on a factual assertion that petitioner told his trial counsel that he had
4  asked for his mother during the police interview, as well as the other facts in the declaration he
5  attached to his habeas petition in state court.  Neither of these claims is persuasive.

### A. STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09 (2000), while the second prong applies to decisions based on factual determinations. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is an "unreasonable application of" Supreme Court authority, such that it falls under the second clause of Section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Williams (Terry)*, 529 U.S. at 413.  A writ may not issue "simply because [the] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340.  A petitioner must present clear and convincing evidence to overcome Section 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Bragg v. Galaza*, 242 F.3d 1082, 1087, *amended*, 253 F.3d 1150 (9th Cir. 2001).  Under Section 2254(d)(2), a state court decision "based on a factual determination will

8

1  not be overturned on factual grounds unless objectively unreasonable in light of the evidence
2  presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

3  The state court decision to which Section 2254(d) applies is the "last reasoned decision"
4  of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991). The California Court of
5  Appeal and Supreme Court denied petitioner's habeas claims without comment after petitioner
6  appealed the Superior Court's decision on his petition. The decision of the Superior Court is thus
7  the last reasoned decision of the state court. The vast majority of petitioner's arguments in both
8  his petition and his reply brief concern factual matters, so those will be addressed first.

### B. FACTUAL DETERMINATIONS

10  Petitioner's primary argument is that the state Superior Court got it wrong on the facts.
11  Petitioner brings up the fact that, at trial, Attorney Clay asked Sergeant Brock whether petitioner
12  asked for his mother. Petitioner tries to argue that the following facts to which Attorney Clay
13  testified at the evidentiary hearing are inconsistent relative to this fact: (1) even though Attorney
14  Clay testified that petitioner did not tell him he asked to see his mother (*see* Exh. O at 77),
15  (2) Attorney Clay testified that he asked Sergeant Brock whether petitioner had asked for his
16  mother so hopefully Brock would say that he *had*, and then Attorney Clay would have had an
17  opening to argue that petitioner had asked for his mother and that therefore the *Miranda* waiver
18  was invalid (*see* Exh. O at 87–88).

19  Petitioner argues that Number Two undermines the credibility of Number One. Petitioner
20  is wrong. That Attorney Clay asked this of Sergeant Brock is *not* proof that petitioner told Clay
21  he asked to see his mother. And it is *not* proof that Attorney Clay had promised petitioner that he
22  would file a separate motion to suppress on this basis (*see* Reply at 27). Petitioner has not
23  presented clear and convincing evidence that the state court's factual determinations were
24  incorrect. The state court decision held that these different points of testimony were not
25  inconsistent and did not undermine Attorney Clay's credibility when he testified that petitioner
26  did not tell him he had asked to see his mother (*see* Exh. P at 11–12). The state court's decision
27  based on these factual determinations was not objectively unreasonable. In fact, the state court
28  was spot on in finding that Attorney Clay likely asked these questions of Brock to simply probe

9

any unknown foundation for the motion to suppress. They do not in any way show that petitioner told Clay that he had asked to see his mother.

Petitioner attempts to present other evidence to undermine Attorney Clay's credibility and to undermine a finding that petitioner did not tell Attorney Clay that he had asked to speak to his mother during the interview. Attorney Clay executed a declaration in 2002 in which he stated that he was not aware of a specific procedure whereby he would require the state to present a prima facie case before the prosecution could be permitted to leave juvenile court (*see* Exh. R 25–26). This fact does not undermine Attorney Clay's testimony that petitioner did not tell him he had asked to see his mother during the interview, nor that the officers had promised he could leave. Petitioner's counsel is trying to confuse the issue of whether there is clear and convincing evidence that the state court made improper factual findings with making a different legal determination as to the effectiveness of counsel based on different facts. The fact that Attorney Clay executed this declaration is not clear and convincing evidence that the state court was wrong to find him credible.

Similarly, petitioner brings up a red herring issue concerning whether Attorney Clay told habeas counsel for petitioner that he did not remember whether petitioner told him whether he had asked to see his mother during the interview at some time prior to the evidentiary hearing. Again, this does not undermine the state court's finding that Attorney Clay was a credible witness. Whatever Attorney Clay may or may not have said about the clarity of his memory prior to the evidentiary hearing, at the evidentiary hearing he testified definitively that petitioner did not tell him he asked to see his mother (*see* Exh. O at 77).

Petitioner's counsel then argues simply based on his review of testimony at the evidentiary hearing that the state court should have found petitioner credible instead of the other witnesses. This argument is not based on a claim that a new evidentiary hearing is needed but rather that the state court's findings were wrong based on the existing record. There is no clear and convincing evidence that the state court made incorrect factual determinations. Moreover, the state court's decision based on these factual findings was not objectively unreasonable.

10

### C. LEGAL DETERMINATIONS

Petitioner secondarily argues, without putting it in these terms, that the Superior Court's decision involved an unreasonable application of clearly established federal law. Petitioner argues that it was an unreasonable application of law for the state court to determine that petitioner's trial counsel's failure to bring a separate motion to suppress and failure to require the state to make out its prima facie case in the juvenile proceedings was not ineffective assistance. This is incorrect.

The Sixth Amendment entitles criminal defendants to the effective assistance of trial counsel. To establish that counsel provided ineffective assistance, defendants must show that: (1) counsel's performance was deficient under the standards of reasonable lawyering, and (2) there is reasonable probability that, but for counsel's ineffectiveness, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. 664, 694 (1984).

The state court was correct that, based on the factual determinations described above, petitioner's trial counsel did not provide ineffective assistance.

*First*, petitioner argues that his trial counsel provided ineffective assistance in failing to bring a motion to suppress the evidence separate from joining that of petitioner's co-defendant. This argument is based on the premise that petitioner's waiver was invalid. In the case of juveniles, whether a waiver is valid depends on the totality of the circumstances, including the minor's background, experience, age, education, intelligence, and capacity to understand the warnings, the nature of the Fifth Amendment rights, and the consequences of waiving those rights. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). Given the factual determinations reviewed above, and under this standard, petitioner's waiver was valid. Therefore, petitioner's trial counsel's performance was not deficient. His success on a motion to suppress was not affected by the fact that he orally joined Mr. Galbraith's motion rather than bringing a separate motion, because either way the motion would have been denied given that the waiver was clearly valid based on the factual determinations as found by the state court. The state court's decision

on this ground that trial counsel did not provide ineffective assistance is not an unreasonable application of federal law.

*Second*, petitioner argues that his trial counsel provided ineffective assistance in failing to require the prosecution to establish a prima facie case at the juvenile court proceedings, before the presumption that petitioner could be tried as an adult could apply. Under state law, because the prosecution had charged petitioner with a crime triggering a presumption that petitioner was fit to be tried as an adult despite his minor status, petitioner could have first required the prosecutor to establish a prima facie case at the fitness hearing before the presumption of unfitness could apply. *See Marcus W. v. Superior Court*, 98 Cal. App. 4th 36, 41 (2002). A "prima facie" case amounts to "sufficient cause" within the meaning of Penal Code Sections 871 and 872, which is generally equivalent to "reasonable and probable cause," or the state of facts that would lead an ordinary person "to believe and conscientiously entertain a strong suspicion of the guilt of the accused." *Edsel P. v. Superior Court*, 165 Cal. App. 3d 763, 780 n.10 (1985). Petitioner asserts that his trial counsel rendered ineffective assistance in failing to require the prosecution to establish a prima facie case, because the prosecution would not have been able to make out a prima facie case if the juvenile court concurrently found the *Miranda* waiver at the interview invalid.

But, again, based on the factual findings of the state court, reviewed above, petitioner's waiver was valid, so the fact that trial counsel did not request that the prosecution be required to make out a prima facie case before the action was sent from juvenile court was not deficient assistance of counsel. Had trial counsel required the prosecutor to establish a prima facie case, the interview statements would have been introduced, and a motion raised by trial counsel to suppress them would have been denied. The state court's decision on this ground that trial counsel did not provide ineffective assistance is not an unreasonable application of federal law.

## CONCLUSION

The petition for a writ of habeas corpus is **DENIED**. Judgment will be entered in favor of respondents.

Rule 11(a) of the Rules Governing Section 2254 Cases requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the

12

petition is denied. Petitioner must make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). He has failed to do so. Consequently, a certificate of appealability is denied.

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: December 7, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE